**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| TREPP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>VICEROY RESEARCH LLC,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **JURY DEMAND**<br><br>Civil Action No. 1:23-cv-11154 |

**VERIFIED COMPLAINT**

Plaintiff Trepp, Inc. ("Trepp" or the "Company") files this Verified Complaint against Defendant Viceroy Research LLC ("Viceroy" or the "Defendant") and in support thereof avers as follows:

**INTRODUCTION**

1. This case concerns Viceroy's intentional misappropriation and public dissemination of Trepp's proprietary and trade secret information.

2. Trepp offers a suite of structured finance products on its proprietary institutional grade analytics subscription platform, which incorporate and utilize Trepp's extensive compilations and analyses of data relating to commercial real estate ("CRE"), commercial mortgage-backed securities ("CMBS"), and collateralized loan obligations ("CLOs"). Trepp's structured finance products are superior to any other similar services currently on the market because Trepp has devoted significant time, money and resources to compile, process, and analyze its structured finance data as well as to develop its underlying data-gathering and data-processing techniques, methodologies, and calculations.

3. Trepp offers its structured finance services only to paying customers and subject to Trepp's Customer Order Form, Terms and Conditions, and Terms of Use, which impose stringent confidentiality obligations and expressly restrict each customer's use of Trepp's information.

4. Viceroy has either gained unauthorized access to or otherwise obtained Trepp's proprietary and trade secret structured finance data and analyses, despite the fact that Viceroy is not now, and never has been, a customer or authorized user of Trepp's services. Making matters worse, Viceroy has used and publicly disseminated Trepp's trade secret information ***after*** Trepp advised Viceroy that Viceroy does not have permission to possess, access, use, or disclose Trepp's proprietary and trade secret information, and that Viceroy must immediately cease using any such information and return it to Trepp.

5. Trepp brings this action to enjoin Viceroy from further misappropriating Trepp's trade secrets. Further, Trepp seeks monetary damages caused by Viceroy in the form (among others) of lost profits, lost customers, lost business opportunities, and the disclosure and use of its trade secret information.

## PARTIES

6. Trepp is a Delaware corporation with a principal place of business located at 600 Fifth Avenue, 7th Floor, New York, New York 10020. Trepp is a leading provider of information, analytics, and services to the structured finance, CRE, and banking markets. Trepp is the owner of the trade secrets misappropriated by Viceroy.

7. Upon information and belief, Viceroy is a Delaware limited liability company with its principal place of business located at 1201 Orange Street, Suite 600, Wilmington, Delaware 19801. Founded in 2016, Viceroy purports to be an investigative financial research

group, which touts its reports raising "red flags" on "many companies" located throughout the United States. Viceroy does business throughout the United States, including in this District.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over Trepp's federal trade secret claim pursuant to 18 U.S.C. § 1832 *et seq*. and 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Trepp's state law claim pursuant to 28 U.S.C. § 1367.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this District, and Viceroy is otherwise subject to personal jurisdiction in this District with respect to this action.

## FACTUAL BACKGROUND

### A. Trepp's Business and Trade Secrets

10. Founded in 1979, Trepp is the leading provider of data, insights, and technology solutions to clients in the structured finance, commercial real estate, and banking markets. Trepp creates and provides clients with proprietary information and analytics designed to increase operational efficiencies, information transparency, and investment performance.

11. Trepp's proprietary institutional-grade analytics platform offers a complete picture with multiple reference points for debt, equity, operating, and market performance analysis. Through its proprietary platform, Trepp offers a suite of products with respect to CMBS, CRE, and CLOs.

12. With respect to Trepp's CRE analytics product in particular, Trepp has extensively gathered, processed, and analyzed years of historical capital market quality commercial real estate loan and property data and has uniquely analyzed and compiled such data

in order to create and author the largest available catalog of securitized loans on the market. Trepp has integrated this compilation of information into a robust analytics platform that permits subscribers to access and run queries on such data in order to obtain valuable insight into both securitized and non-securitized commercial mortgages and properties, whole loan portfolios, and nationwide commercial mortgage financial statistics.

13. Trepp's extensive and exclusive compilation and catalog of its proprietary CRE data has permitted to Trepp to create superior products and services to clients seeking to find deals, manage assets and measure their performance, or search for geographical statistics and trends for comps and benchmarking.

14. Similarly, with respect to Trepp's CMBS product, TreppCMBS Analytics, Trepp has analyzed and compiled robust data with respect to commercial mortgage-backed securities and collateralized commercial real estate, among other data points, to create proprietary data sets and integrate such data into a suite of services that permits its clients to easily analyze individual deals or whole CMBS portfolios, including cash flow projections, flexible waterfall modeling, price/yield, discount margin calculations, and optimal call date determination.

15. TreppCMBS Analytics is widely recognized as the industry standard for CMBS trading, surveillance, pricing, risk management, and portfolio analysis. Trepp is acknowledged as the market leader in its analysis of bonds and cashflow models. TreppCMBS Analytics is delivered through web-based investment monitoring analytics, data feed, API, an excel add-in, Trepp's business intelligence platform, and advisory and training services.

16. Trepp's unique compilation and analyses of its CMBS data allows its customers to generate cashflows, produce yield tables, analyze bonds and portfolios, and conduct deep credit-based work. Powerful processing capabilities for batch calculations paired with a robust

database enable advanced grouping and loan-level scenario capabilities as well as bond-level total return analysis.

17. Trepp's compilations and analyses of the foregoing structured finance data, as well as Trepp's underlying data-gathering and data-processing techniques, methodologies, and calculations, constitute Trepp's proprietary and trade secret information. Trepp maintains confidentiality and control over its structured finance data, and its underlying compilations and calculations of such data in particular, and only permits prescribed access to such information by "Designated Users" of Trepp clients who are subject to stringent confidentiality obligations and restrictions on use contained in Trepp's Terms and Conditions and Terms of Use incorporated into each Customer Order Form.

18. Trepp's proprietary and trade secret information is not available to the public. Trepp developed its structured finance data and analyses over its 40-plus years in operation and through the course of a lengthy, ongoing, and expensive data gathering and analytical process involving numerous employees, systems, and trial and error. No other competitor of Trepp has access to Trepp's specifically customized structured finance data, and there are no manuals or other instructions that would allow a competitor to readily recreate the structured finance data compiled, analyzed, and offered by Trepp, thus providing Trepp with a competitive advantage.

19. A competitor could not replicate Trepp's structured finance data compilations or products, and the other proprietary and trade secret information associated therewith, without a significant investment of time, money and other resources.

**B. Trepp Maintains the Secrecy of Its Proprietary and Trade Secret Information.**

20. Trepp takes extensive steps to maintain the secrecy of its proprietary and trade secret information, including, without limitation, Trepp's compilation and analyses of structured finance data offered on its analytics platform.

21. Trepp's structured finance products and services are not available to the public, and Trepp maintains complete discretion as to who will be permitted to sign up for its CMBS and CRE services. In order to sign up for TreppCRE or TreppCMBS, a prospective customer must contact a Trepp salesperson and go through a contracting process. Additionally, each subscriber pays significant subscription fees in order to access these services – $10,950 per month for TreppCMBS, and at least $2,700 per month for TreppCRE.

22. Additionally, prior to requesting access or subscribing to Trepp's CMBS library, the prospective customer must certify that it is a holder of the securities noted in the information or is otherwise qualified to access and receive the information.

23. Once Trepp does approve a customer for structured finance services, Trepp requires each such customer to execute a Customer Order Form, which expressly incorporates Trepp's Standard Terms and Conditions and Terms of Use.

24. Trepp's Terms and Conditions contain clear terms of confidentiality as well as restrictions on use of the information provided through Trepp's platform, including all structured finance data.

25. For example, Trepp's Terms and Conditions provide, in relevant part, that Trepp's services are provided for use only by "Designated Users" of a given customer for "internal business purposes," and such information "may not be provided to, or used or accessed by any other person or entity (including, without limitation, any other employee of any other

department, business unit or division of Customer) without Trepp's prior written consent." (A true and correct copy of Trepp's Terms and Conditions are attached hereto as **Exhibit A**.) The only exception to the foregoing limitation is that a customer may "use or cite ***discrete portions*** of the Trepp data" in presentations to "clients or partners," provided, however, that such information is not provided in a way that would substitute Trepp's services, among other limitations. (*See* Ex. A § 5.1 (emphasis added).)

26. Further, Trepp's Terms and Conditions provide that each customer agrees "that the data compilation supplied through the Services is not in the 'public domain' but is proprietary to Trepp," and they state as follows with respect to passwords:

> Trepp will authorize a password for each Designated User of the Service. That password is personal to the Designated User and such Designated User is obligated to keep the user name and password confidential and may not share the password with any other employee of Customer. Customer may change Designated Users and obtain new passwords for such Designated Users upon prior written notice to Trepp. Customer, shall immediately notify Trepp if any third party gains or has the potential to gain access to any of Customer's passwords, and shall be fully responsible for any and all activities that occur under any password, whether conducted by a Designated User, other employee or a third party.

(*Id.* §§ 8.2, 8.3.)

27. Trepp's Terms of Use likewise explicitly restrict each user's access to and use of Trepp's confidential and proprietary structured finance data.

28. To start, Trepp's Terms of Use explicitly prohibit Trepp clients from using information derived through Trepp's services for "external purposes," stating as follows:

> You agree not to copy, reproduce, recompile, redistribute, retransmit, broadcast, or circulate the information, data, software and analytics received through the Trepp Service, in whole or in part, without the express prior written consent of Trepp, except that the information may be downloaded or printed for your personal, internal use. ***Except for the dissemination of a limited amount of***

> ***information available from the Trepp Service to support the user's primary internal business purposes (such as mention of isolated data in reports to your clients or limited derived calculations based on such information), in no event may you use information available through the Trepp Service for external purposes***, including, without limitation, the use of cashflows or other data from the Trepp Service in furtherance of any bond issuance, or the creation of a performance index. Any external use of information from the Trepp Service will require the prior written consent of Trepp and may also require the payment of an additional fee to Trepp, as may be mutually agreed upon by the user and Trepp.

(*See Terms of Use*, Trepp, https://www.trepp.com/terms-of-use# (last accessed Dec. 20, 2023) (emphasis added).)

29. Similarly, the Terms of Use prohibit any client from "framing, mirroring, scraping, or data mining" any Trepp service or content as well as the employment of any "collaborative browsing or display technologies in connection" with the use of any Trepp service. (*Id.*)

30. Finally, each Trepp customer agrees in the Terms of Use not to "[m]odify, adapt, sublicense, translate, resell, retransmit, reverse engineer, decompile, or disassemble any portion of the Trepp Service." (*Id.*)

31. Trepp also takes steps internally to protect its proprietary and trade secret structured finance information. Such information is stored on protected drives that may only be accessed on a need-to-know basis using employee-specific login credentials and passwords. Moreover, the Company instructs its employees not to use or disclose Trepp's confidential information for the benefit of anyone other than the Company.

32. Trepp further protects its proprietary and trade secret information by limiting the content of any public disclosure and otherwise ensuring that any private disclosure to customers

is made only to the extent necessary and is covered by the Customer Order Forms, Terms and Conditions, and Terms of Use, as summarized above.

33. Trepp uses and relies upon its proprietary and trade secret information to maintain a competitive position.

34. Trepp's proprietary and trade secret information derives its value from remaining confidential.

35. If disclosed, Trepp's proprietary and trade secret information would provide an unfair advantage to a competitor. Moreover, such disclosure would essentially render valueless those portions of Trepp's structured finance products and services.

**C. Viceroy's Misappropriation and Publication of Trepp's Trade Secrets**

36. Viceroy is not now, and never has been, a Trepp customer. Accordingly, Viceroy does not have access to and may not have possession of Trepp's proprietary and confidential compilation and analyses of structured finance data available exclusively on Trepp's analytical platform.

37. On or about November 29, 2023, Viceroy authored and published a "November CLO Update," which contained and cited to Trepp's confidential and proprietary structured finance data with explicit attribution to Trepp. (A true and correct copy of the November 29, 2023 "November CLO Update" is attached hereto as **Exhibit B**.) More specifically, Viceroy's publication announced that certain "underlying CLO performance data" for a particular entity was "live on Trepp" and that Viceroy had analyzed it. (*Id.*) Additionally, Viceroy cited to Trepp data beneath each of the figures contained in the November CLO Update. (*Id.*)

38. Upon information and belief, Viceroy either received Trepp's proprietary and trade secret information through a Trepp customer in breach of that customer's confidentiality

obligations and restrictions on use or by directly accessing Trepp's systems using stolen or borrowed credentials and without authorization.

39. When Trepp learned of Viceroy's November CLO Update upon its publication, the Company immediately contacted Viceroy that same day to demand that Viceroy immediately remove Trepp's information from its publication and cease any further use of the same. (A true and correct copy of Trepp's November 29, 2023 correspondence with Trepp is attached hereto as **Exhibit C**.)

40. Viceroy responded that it would amend its November CLO Update so that it no longer referenced Trepp or its data, but would instead only reference "trustee data." (*See id.*)

41. However, a review of Viceroy's "updated" November CLO Update – which remains available on its website – makes clear that Viceroy continues to cite to and publish Trepp's confidential and proprietary structured finance data, as nothing has substantively changed within the publication except for the removal of explicit references to "Trepp." (A true and correct copy of Viceroy's updated "November CLO Update," which remains available at https://viceroyresearch.org/2023/11/29/arbor-realty-trust-november-clo-update, is attached hereto as **Exhibit D**.)

42. As a result of Viceroy's refusal to remove from public view and destroy Trepp's proprietary structured finance data, Trepp sent Viceroy a letter through counsel on or about December 8, 2023, demanding that Viceroy cease and desist from any further use or publication of Trepp's information and that it identify how it obtained Trepp's information by December 15, 2023. (A true and correct copy of Trepp's December 8, 2023 letter to Viceroy is attached hereto as **Exhibit E**.)

43. Trepp's November 29 and December 8 letters explicitly put Viceroy on notice of its unauthorized use and publication of Trepp's trade secrets, and that its further use and publication of such data would subject Viceroy to liability under the federal Defend Trade Secrets Act, among other sources of liability. (*See id.*) Moreover, to the extent Viceroy received Trepp's information from a Trepp customer, Trepp's December 8, 2023 letter put Viceroy on notice that its receipt of such information from that customer was in violation of the confidentiality and other obligations that each Trepp customer must agree to prior to gaining access to Trepp's platform. (*Id.*)

44. On December 11, 2023, Viceroy acknowledged Trepp's cease and desist letter and stated that it would respond in "due course." However, as of the date of this filing, Viceroy has not responded to Trepp's December 8, 2023 correspondence.

45. Notwithstanding Viceroy's silence as to the substance of Trepp's cease and desist letter, however, Viceroy has since made clear publicly that it has no intention on stopping its unauthorized use and disclosure of Trepp's confidential and proprietary structured finance information.

46. Quite to the contrary, Gabe Bernarde – the co-founder of Viceroy Research – participated in a public YouTube interview published *on December 14, 2023* in which he:

a. falsely claims that Viceroy has a Trepp subscription and states that Viceroy has retrieved its structured finance data "from Trepp";

b. screenshares with the public audience Trepp's excel spreadsheet containing its proprietary and trade secret structured finance data compilation and analyses; and

c. expressed his intention of sending Trepp's proprietary spreadsheet and information to the interviewer after the interview's conclusion.

(GowerCrowd, *With an entire $7bn portfolio underwater, these CLOs are set to collapse*, YouTube (Dec. 14, 2023) at 39:48-43:40, https://www.youtube.com/watch?v=G1MdC2E9FTU.)

47. With respect to Trepp's excel spreadsheet in particular, Mr. Bernarde screenshared with the interviewer Trepp's proprietary "Market Loan Listing" document that is available exclusively on Trepp's restricted platform and available only to paying customers subject to Trepp's Terms and Conditions and Terms of Use. (*See id.*) This spreadsheet contains Trepp's proprietary and confidential compilation and analyses of structured finance data, including, without limitation, information on more than 300 loans across approximately 140 columns of subcategories of data that Trepp has analyzed and processed. (*Id.*) Mr. Bernarde thereafter scrolled through Trepp's spreadsheet with the interviewer and explained the type of data contained therein and what can be found with respect to each CLO. (*Id.*) Mr. Bernarde likewise screenshared the particular "Trepp Loan ID" populated by Trepp during its analyses and compilation of such data:

(*Id.*)

48. Since publication of the interview with Mr. Bernarde on YouTube, there has already been at least one viewer interested in receiving Trepp's proprietary spreadsheet impermissibly displayed during the interview:




(*See id.*)

49. Upon information and belief, Viceroy has continued to distribute Trepp's spreadsheet containing its proprietary and trade secret structured finance information to those interested in Mr. Bernarde's interview or Viceroy's November CLO Updates and related publications.

50. As a direct and proximate result of Viceroy's unauthorized use and distribution of Trepp's trade secrets, Trepp has suffered, and will continue to suffer, irreparable harm.

51. Absent relief from the Court, Viceroy's conduct will cause Trepp to suffer further irreparable harm in the form of disclosure and use of its trade secret information, which Trepp has invested significant time and resources to develop, as well as lost profits, lost customers, and lost business opportunities.

**COUNT I**
**TRADE SECRET MISAPPROPRIATION**
**FEDERAL DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *et seq.*)**

52. Trepp incorporates the foregoing paragraphs as though fully set forth herein.

53. Trepp owns and possesses certain trade secret information alleged above, including, without limitation, Trepp's analyses and compilation of structured finance data on its proprietary analytics platform as well as Trepp's underlying data-gathering and data-processing techniques, methodologies, and calculations.

54. Trepp's trade secret information relates to products and services used in, or intended for use in, interstate or foreign commerce.

55. Trepp has undertaken efforts that are reasonable under the circumstances to maintain the secrecy and confidentiality of the trade secrets at issue.

56. Trepp's trade secret information derives independent economic value from not being generally known to and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

57. Viceroy knew under the circumstances that the information misappropriated by Viceroy constitutes Trepp's trade secrets, particularly in light of Trepp's various correspondence to Viceroy demanding that it cease further unauthorized use and distribution of Trepp's protected information.

58. Defendants misappropriated and threaten to further misappropriate Trepp's trade secrets by, at the very least, acquiring Trepp's trade secrets with knowledge of or reason to know that the trade secrets were acquired by improper means or through a person who owed a duty to Trepp to maintain the secrecy of Trepp's trade secrets or limit the use of Trepp's trade secrets. Further, Defendants are using and threatening continued use of the trade secrets acquired by improper means without Trepp's consent.

59. As a direct and proximate result of Viceroy's conduct, Trepp has suffered and, if Viceroy's conduct is not stopped, will continue to suffer severe irreparable injury including,

without limitation, the loss of its trade secrets and significant damages in an amount to be proven at trial.

60. Trepp has also incurred, and will continue to incur, additional damages, costs and expenses as a result of Viceroy's misappropriation. As a further proximate result of the misappropriation and use of Trepp's trade secrets, Viceroy has been unjustly enriched.

61. The aforementioned acts of Viceroy were willful, malicious and fraudulent. Trepp is therefore entitled to an award of punitive damages.

62. The aforementioned acts of Viceroy were undertaken in bad faith. Trepp is therefore entitled to an award of reasonable attorneys' fees.

63. Viceroy's actions constitute misconduct of a continuing nature for which Trepp has no adequate remedy at law. Unless and until enjoined and restrained by order of this Court, Viceroy will continue to retain and use Trepp's trade secrets to enrich themselves through the use and publication of information that Trepp has expended significant time and resources to develop, keep confidential, and provide for limited use by authorized customers subject to confidentiality and use restrictions.

## COUNT II
## COMMON LAW MISAPPROPRIATION OF TRADE SECRETS

64. Trepp incorporates the foregoing paragraphs as though fully set forth herein.

65. For the reasons set forth above, Viceroy's conduct constitutes trade secret misappropriation under New York law, and Trepp is entitled to all appropriate relief provided for therein.

## PRAYER FOR RELIEF

WHEREFORE, Trepp Inc. respectfully requests judgment in its favor and against Defendant Viceroy Research LLC as follows:

(a) Upon hearing, a preliminary injunction to issue immediately and, upon final trial, a permanent injunction,

i) Enjoining and restraining Defendant from further misappropriating, using, disclosing, publishing, or otherwise disseminating Trepp's proprietary and trade secret information;

ii) Ordering the Defendant to return to Trepp and to delete from its possession all of Trepp's proprietary and trade secret information;

iii) Ordering the Defendant to stop describing or representing itself as a Trepp customer and to correct any and all statements to that effect which it has made publicly or otherwise;

iv) Ordering Defendant to request that any public dissemination of Plaintiff's proprietary and trade secret information that is no longer within Defendant's control – i.e., the YouTube interview with Mr. Bernarde – be removed; and

v) Ordering any other relief that is just and proper under the circumstances.

(b) After a final hearing, an award in Trepp's favor and against Defendant for compensatory damages, disgorgement of all profits improperly obtained by the Defendant's use of Trepp's trade secrets, reimbursement of all costs incurred in connection with this litigation, punitive damages and such other relief as the Court deems proper.

**JURY TRIAL DEMANDED ON ALL CLAIMS SO TRIABLE.**

Respectfully submitted,

DENTONS COHEN & GRIGSBY P.C.

By: *s/ Lucy E. Hill*

Lucy E. Hill (NY 5202643)
Fridrikh V. Shrayber
(*admission pro hac vice forthcoming*)
Jared M. DeBona
(*admission pro hac vice forthcoming*)
625 Liberty Avenue, 5th Floor
Pittsburgh, PA 15222-3152
Ph: 412-297-4900 / Fax: 412-209-1922
lucy.hill@dentons.com
fred.shrayber@dentons.com
jared.debona@dentons.com

*Attorneys for Plaintiff,*
*Trepp, Inc.*

Dated: December 22, 2023
4521733

**VERIFICATION**

I, Jennifer Termini, am Director, Associate Counsel at Trepp Inc. I have read the foregoing Verified Complaint and, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Jennifer Termini